IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 4, 2016

## IN RE MADDOX C.

**Appeal from the Chancery Court for Dickson County**
**No. 2014-CV-431    Suzanne Lockert-Mash, Judge**
———————————————————

**No. M2016-01129-COA-R3-PT- Filed November 9, 2016**
———————————————————

This is a termination of parental rights case. Father/Appellant, who is incarcerated, appeals the termination of his parental rights to the minor child. The trial court terminated Father's parental rights on two statutory grounds: (1) abandonment, and (2) incarceration for more than ten years, s*ee* Tenn. Code Ann. §§ 36-1-113(g)(1) and (6), and on its finding that termination of Father's parental rights is in the child's best interest. Discerning no error, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Bradley Kyle Sanders, Dickson, Tennessee, for the appellant, Christopher H.

Travis Nathaniel Meeks, Clarksville, Tennessee, for the appellees, Brittnie B., and Brandon B.

## OPINION

### I. Background

The minor child, Maddox C.,[1] was born in July of 2009. The child's mother, Brittnie B., and the child's father Christopher H. ("Father" or "Appellant") were never married.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

Brittnie B. and Christopher H.'s relationship ended in early 2011, and Brittnie B. married Brandon B. (together with Brittnie B., "Appellees") sometime in 2012. Appellees have one child together, Jackson B., who was two years old at the time of the hearing. At all relevant times, Maddox has lived with Appellees.

On September 19, 2012, the Dickson County Juvenile Court entered an order, which was admitted as Trial Exhibit 4. The order established Appellant as Maddox's biological father and ordered Appellant to submit to random drug tests as ordered by the court. Concurrent with its September 19, 2012 order, the juvenile court entered a permanent parenting plan, which granted Appellant visitation with the child and ordered him to pay $305 per month in child support.

On January 28, 2013, the juvenile court granted Brittnie B. a restraining order against Father. The restraining order, which was admitted as Trial Exhibit 5, suspended Appellant's visitation. Thereafter, Brittnie B. moved the juvenile court to order hair follicle testing on Father; this motion was heard on February 13, 2013. In its order of February 26, 2013, the juvenile court noted that Father "announced to the court that he had in fact been arrested on a new indictment and that he anticipated being arrested [for] violation of probation." The juvenile court found that the hair follicle test was unnecessary in light of Father's pending legal troubles, but ordered that the restraining order would "become permanent until further order of the court." On June 4, 2013, Father was incarcerated, where he remained during the pendency of the petition to terminate his parental rights.

On December 11, 2014, Appellees filed a petition in the Chancery Court for Dickson County (the "trial court") to terminate Father's parental rights and for Brandon B. to adopt Maddox. As grounds for termination of Appellant's parental rights, Appellees averred: (1) abandonment pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) as defined by Tennessee Code Annotated Section 36-1-102(1)(A)(iv); and (2) Father's being sentenced to ten or more years of incarceration when Maddox was less than eight years old pursuant to Tennessee Code Annotated Section 36-1-113(g)(6). On January 12, 2015, Appellees filed a motion for the appointment of a guardian ad litem to represent Maddox.

On or about February 23, 2015, Appellant filed a handwritten document in the trial court. The document, which is titled "Certificate of Service" states, in relevant part, that:

> I'm [Father] writing because I have no way of getting a lawyer . . . . There is a hearing scheduled [for] February 27, 2015. I'm not sure I will be brought to the hearing. I would like to let the Court know I will never sign my parental rights to . . . Brandon B[.]. I am the child's biological father . . . . I would like the Court to postpone this case, and appoint me a lawyer . . . .

On March 16, 2015, the trial court entered an order, appointing an attorney to represent Appellant and appointing a guardian ad litem for the child.

On September 22, 2015, Father filed a motion to dismiss the petition pursuant to Tennessee Rules of Civil Procedure 12.02(4) and (5). In his motion, Father averred that there was insufficient service of process because

> the summons return in this case says, "Served to the IA office at the prison." Pursuant to TCA Section 41-21-301, "Process in a civil action against an inmate in the penitentiary may be served by the proper officer, in the presence of the warden or the assistant warden, and returned as in other cases." [Appellant] submits service of process was insufficient in this case, and that it should be dismissed.

On September 28, 2015, Appellees filed a response in opposition to Father's motion to dismiss, wherein they noted that Father had "filed a pro se response to the petition on February [23], asking for an appointed attorney and responding to the petition for adoption." As such, Appellees argued that Appellant "ha[d] already acknowledge[d] service of process and waive[d] any issue that could be presented in a rule 12 motion."

On January 5, 2016, Father filed an answer to Appellees' petition, wherein he reiterated the argument set out in his Rule 12 motion, *supra*. In addition to renewing his insufficient service of process argument, Appellant denied the material allegations set out in the petition and opposed termination of his parental rights and/or adoption by Brandon B.

On January 6, 2016, the trial court heard Appellant's Rule 12 motion and the petition for termination of parental rights. On March 16, 2016, the trial court entered a memorandum opinion terminating Father's parental rights on the grounds set out in the Appellees' petition and on its finding that termination of Father's parental rights is in the child's best interest. On April 13, 2016, the trial court entered an order terminating Father's parental rights; the April 13, 2016 order incorporates the trial court's March 16, 2016 memorandum opinion. Father's timely appeal followed.

## II. Issues

Father raises four issues for review as stated in his brief:

1. Whether the trial court erred in denying Appellant's motion to dismiss pursuant to Tennessee Rules of Civil Procedure 12.02(4) and (5) due to insufficient service of process?

2.    Whether clear and convincing evidence supports the trial court's determination that Appellant abandoned the minor child?

3.  Whether clear and convincing evidence supports the trial court's decision to terminate Appellant's parental rights based upon his incarceration of a sentence of ten years or more and that the child was under eight years of age at the time of the sentence?

4.    Whether clear and convincing evidence supports the trial court's determination that termination of the parental rights of Appellant is in the best interest of the minor child?

### III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. ***Stanley v. Illinois***, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. ***Nash-Putnam***, 921 S.W.2d at 174-75 (citing ***Santosky v. Kramer***, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769, 102 S.Ct. 1388. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Analysis

### A. Service of Process

Tennessee Code Annotated Section 41-21-301 provides that "[p]rocess in a civil action against an inmate in the penitentiary may be served by the proper officer, in the presence of the warden or the assistant warden, and returned as in other cases." Relying on this statute, Father filed a motion to dismiss this action based on alleged improper service of process.

At the January 6, 2016 hearing on the petition to terminate his parental rights, Father testified that he received the Appellees' petition by going "up to the mail window and the mail lady gave it to me." When he was questioned as to whether the warden or assistance warden was present at the time he received the petition, Father answered "No." From Father's testimony and his filings in the trial court, we glean that his argument that process was improperly served stems from the fact that he received a copy of Appellees' petition by picking it up at the mail window at the prison and that he was not served "in the presence of the warded or assistant warden." In ruling on Appellant's motion to dismiss, the trial court's April 13, 2016 order states, in relevant part, that Father

> admitted he received the Petition and that he responded in writing to this Court. In his written response to the Court he requested that he be appointed an attorney and that a hearing be held in the matter in which he could participate. Therefore, the Court finds that service of process in this matter was sufficient and therefore the [Appellant's] motion is respectfully denied.

The response "in writing," which is referenced in the trial court's order, is the February 23, 2015 "Certificate of Service" document that Father filed. As correctly noted by Appellees in their appellate brief, Father did not allege insufficient service of process in this initial filing. The "Certificate of Service" document evinces three facts that negate Appellant's insufficient service of process argument. First, although not in the presence of the warden or assistant warden, Father personally received the petition. Second, his responsive filing shows that

Father had actual knowledge of the proceedings. Finally, his responsive filing failed to assert insufficient service. "The filing of any pleading, making or resisting of any motion, . . . or any other act in the cause, between the filing of the complaint and rendition of the final decree, whereby pendency of the suit is recognized, expressly or by implication, will, if there be record evidence of the fact, constitute a general and unlimited appearance, unless limited by express declaration or by necessary implication." *Patterson v. Rockwell International*, 665 S.W.2d 96, 99 (Tenn. 1984) (citing *Akers v. Gillentine*, 231 S.W.2d 372,376 (Tenn. Ct. App. 1950), *perm. app. denied* (Tenn. March 31, 1950)).

Similar to the case at bar, in *John V. L. v. Dep't of Children's Servs.*, No. W2011-01397-COA-R3-JV, 2011 WL 5454319 (Tenn. Ct. App. Oct. 25, 2011), *perm. app. denied* (Tenn. Feb. 15, 2012), appellant/father argued that "under Tennessee Code Annotated § 41-21-301, service on [a]ppellant[/father] in the transfer facility in Texas was insufficient where it was not in the presence of the warden or assistant warden." In *John V. L.*, this Court held, in relevant part, that:

> Appellant does not appear to have specifically pled insufficient service under Tennessee Code Annotated § 41-21-301 in the pleadings filed in the juvenile court. . . . Additionally, . . . the testimony of DCS's attorney was that Appellant was served by certified mail at a transfer facility in Abilene, Texas, and that the bailiff at the facility had signed the return receipt.

> Assuming that Appellant did not waive the affirmative defense of insufficiency of process in the juvenile court, however, by failing to specifically assert insufficiency pursuant to Tennessee Code Annotated § 41-21-301, it is undisputed that DCS served Appellant by certified mail to the transfer facility in Texas . . . [and] that Appellant had actual knowledge of the petition, an opportunity to defend against it, and was represented by appointed counsel. . .

> ***

> In this case, . . .we find nothing in the juvenile court record to indicate that he specifically asserted insufficient service of process under Tennessee Code Annotated 41-21-201. . . . DCS served Appellant with the . . . petition and summons by certified mail, return receipt requested; a signed receipt was returned; Appellant had actual knowledge of the proceedings; and Appellant was zealously represented by counsel throughout the proceedings in the juvenile and circuit courts. . . . Appellant's argument in this Court. . . is that service of process . . . was not procedurally sufficient where service was not received by the warden or assistant warden, but by the bailiff. In light of the

- 6 -

totality of the circumstances, any alleged procedural insufficiency was remedied when the matter proceeded . . . in compliance with all procedural requisites.

*John V. L.*, 2011 WL 5454319, at \*3-4. Likewise, in the instant case, Father did not assert insufficient service of process in his initial filing with the trial court. Furthermore, he acknowledged receipt of the Appellees' petition and had the opportunity to defend against it. Moreover, Father was represented by a court-appointed attorney during the termination of parental rights proceedings. For all of these reasons, we conclude that "any alleged procedural insufficiency was remedied when the matter proceeded . . . in compliance with all procedural requisites." *Id* at \*4. Accordingly, the trial court did not err in denying Appellant relief under Tennessee Rule of Civil Procedure 12.02(4) or (5).

## B. Grounds for Termination of Parental Rights

As noted above, the trial court relied on two statutory grounds in terminating Father's parental rights: (1) abandonment; and (2) incarceration for more than ten years. *See* Tenn. Code Ann. §§ 36-1-113(g)(1) and (6). Although only one ground for termination of parental rights must be proven by clear and convincing evidence, Tenn. Code Ann. § 36-3-113(c)(1), the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review both of the foregoing grounds.

### 1. Abandonment

Tennessee Code Annotated Section 36-1-113(g)(1) provides that termination of parental rights may be based on the ground of "[a]bandonment by the parent or guardian, as defined in § 36-1-102. . . ." Tennessee Code Annotated Section 36-1-102(1)(A)(iv) defines abandonment, in relevant part, as follows:

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

*Id.* Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. ***In re Audrey S.***, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Willfulness depends upon the actor's intent, and intent is seldom capable of direct proof. ***Id***. Therefore, the trier-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct. ***Id***. "Whether a parent failed to visit or support their child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." ***In re Adoption of Angela E.***, 402 S.W.3d 636, 649 (Tenn. Ct. App. 2013) (citing ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007)).

Here, it is undisputed that Father was incarcerated on June 4, 2013. Appellees filed their petition to terminate his parental rights on December 11, 2014. Concerning this ground for termination of parental rights, in its April 13, 2016 order, the trial court made the following, relevant findings:

> The Court does find that there is clear and convincing evidence that [Appellant] has willfully failed to pay support for four consecutive months preceding his incarceration and was engaged in conduct prior to his incarceration that exhibits a wonton disregard for the welfare of the child. There was no proof that the [Appellant] sought drug rehabilitation as he presented to the Juvenile Court Judge. Knowing that the [Appellant] was on State probation, had pending criminal charges and was under a Court order to not have contact with his son because of drug activity, the [Appellant] and co-defendants put on masks, armed themselves with a gun and robbed a known drug dealer. Therefore, the Court finds that the [Appellant] abandoned his son based on his willful failure to pay support as well as his pre-incarceration conduct of wonton disregard for the welfare of the child.

Concerning Father's abandonment by willful failure to support the child, in its April 13, 2016 order, the trial court found that Father "paid child support until the end of 2012." Father's testimony at the hearing supports the trial court's finding:

> Q [to Father]. When did you last provide monetary support for Maddox?
> &ast;&ast;&ast;
> A. Since the last time I seen [sic] him and that's it.
> &ast;&ast;&ast;
> Q. End of 2012, beginning of 2013?
>
> A. Yes.

- 8 -

Q. That would be your last support payment.

A. Yes.

As set out above, by order of September 19, 2012, the juvenile court ordered Appellant to pay $305 per month in child support. Father's income on the parenting plan entered by the juvenile court is listed at $1,386. Despite the fact that Father had income during the relevant time period, i.e., four months prior to his incarceration, Brittnie B. testified that she and Brandon B. have been responsible for Maddox's support and that she "received maybe two payments of child support when the visitation got set [by the juvenile court's September 19, 2012 order]." This testimony corroborates Father's testimony that he last paid child support at the end of 2012. Based on the totality of the circumstances, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that Father has abandoned this child by willful failure to provide support during the four months immediately preceding Father's incarceration.

The trial court also found that Father abandoned the child based on his engagement "in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This Court has held that "a parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). However, incarceration alone is not enough to demonstrate a lack of parental fitness; rather, it serves as a trigger mechanism allowing the court to look at the parent's pattern of conduct to determine if it renders the parent unfit or poses a substantial risk of harm to the child. *Id*. This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id*. at 867-868. In this case, all of these elements are present.

Turning to the record, Trial Exhibit 1 is Father's cumulative arrest and indictment record. On or about May 18, 2011, Father was charged with one count of felony possession of marijuana with intent to sell. On April 25, 2012, Father pled guilty to that charge, and the Dickson County Circuit Court sentenced him to two years probation. While on probation, on August 16, 2012 and August 22, 2012, Father was charged with two additional felonies for sale of marijuana. On August 22, 2012, he was also charged with misdemeanor simple possession of a Schedule II drug. On May 16, 2013, he pled guilty to these offenses and was sentenced to four additional years imprisonment (two additional two-year terms) for the felony charges and eleven months and twenty-nine days for the misdemeanor charge; Father was placed on four years community correction. On May 14, 2013, Father was charged with

one count of felony aggravated robbery. The record indicates that Father and an accomplice robbed a rival drug dealer at gunpoint. On April 14, 2014, Father pled guilty to the aggravated robbery charge and was sentenced to an additional nine years imprisonment. The nine year sentence was ordered to run consecutive to the previous sentences.

The foregoing evidence indicates that, since the child was approximately twenty-one months old, Father has engaged in a pattern of criminal activity, which has culminated in a prison sentence of approximately fifteen years. During his testimony, Father readily admitted that he has made some bad choices and "plenty of mistakes" leading up to his current incarceration. Specifically, he stated that following the proceedings in the juvenile court, *see* discussion above, he "wasn't selling drugs anymore or anything like that. I was actually doing straight, you know, trying to do good. For a couple of months. I was doing all right or whatever, trying to do good, and then all this happened." Although Father testified that he was "trying to do good," he continued his testimony, stating, "I get with my buddies and we ended up robbing a drug dealer." Rather than taking full responsibility for his criminal activity, Father attempted to excuse his behavior, stating, "I . . .didn't think . . . that it was something bad I was doing  because I was robbing a drug dealer," and "[I] [d]idn't think [the rival drug dealer] was going to call the police."

Although Father adamantly stated that he would be released on parole in May of 2016, the record indicates that his prison record is not exemplary. Father appeared before the trial court with a cut on his face, which he explained had been sustained in a fight when "three Crips come [sic] into my room and tried to rob me . . . and I fought them all three myself." In addition, Father admitted that he had received a write-up for "disrespect". Father explained that a correctional offer "slammed the door in my face . . .[a]nd I cussed him out over it."

Based on the totality of the circumstances, and in light of Father's cumulative record of criminal offenses, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that Father has engaged in a pattern of activity that "exhibits a wanton disregard for the welfare of the child." ***In re Audrey S.***, 182 S.W.3d at 867-68.

## 2. Incarceration

The trial court also relied on Tennessee Code Annotated Section 36-1-113(g)(6) in terminating Appellant's parental rights. This ground applies where:

> The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

Tenn. Code Ann. § 36-1-113(g)(6).

Father's criminal history is outlined above, and we will not reiterate it here. Clearly, Father has been sentenced to more than ten-years of incarceration, and the sentence was imposed when Maddox was approximately three years old. As stated by Father in his testimony:

Q. And you are serving a 15-year sentence?

A. Yeah. 15 year sentence.

Q. And your son was 3 years old when you went into the penitentiary?

A. Yes.

From Father's undisputed testimony and the record, we conclude that there is clear and convincing evidence to support the trial court's termination of Father's parental rights under Tennessee Code Annotated Section 36-1-113(g)(6).

## C. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then "the interests of parent and child diverge." *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, "Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d at 194.

The Tennessee Legislature has codified nine factors courts should consider in ascertaining the best interest of the child. Applicable factors in this case include, but are not limited to:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conduct, or conditions as to make it safe and in the

- 11 -

child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment . . . for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical conditions;

\*\*\*

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of . . . controlled substances . . . as may render the parent or guardian consistently unable to care for the child in a safe and stable manner.

(9) Whether the parent or guardian has paid child support . . . .

Tenn. Code Ann. § 36-1-113(i)(1)-(9). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R*., 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other factors outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877.

Concerning factors one and two, the trial court made the following, relevant findings in its April 13, 2016 order:

The first and second factors address whether the parent has changed his conduct to the extent that it would be safe and in the best interest of the child to be back in the home. The father's first criminal conviction occurred when his child was approximately two years old. The Father was placed on probation. His next conviction occurred when his child was nearly three years

- 12 -

old. The Father again participated in criminal drug activity and was convicted for another criminal offense when his child was nearly four years old. Additionally, [Father] attempted to justify his behavior in this last criminal incident by proclaiming that the victim was "Just a drug dealer." The Court has not seen any evidence that [Father] has changed his conduct to the extent that it would be safe to place the child back in the home.

The record clearly and convincingly supports the trial court's conclusion that Father has failed to make such adjustment in his conduct as to make it safe for the child to be in his custody.

Concerning factors three, four, and five, the trial court made the following, relevant findings:

From the evidence it is clear to the Court that Father has had minimal contact with his son. It appears that he had visitation with his son until December of 2012, or January of 2013, but due to his criminal activity, his visitation was stopped by the Dickson County Juvenile Court. . . . Because of his continued criminal lifestyle, he has not seen his son for over three years. It may be years before he is released from prison. His son has no meaningful relationship with him. The child is being cared for by the mother and stepfather[,] who has formed a close bond with the child. To effect a change in the child's environment is likely to adversely affect the child's wellbeing.

Both Brittnie B. and Father testified that, at the time of the hearing, Father had not seen the child since early 2013. Appellees both testified that Maddox does not know Father and that he considers Brandon B. to be his "daddy". Furthermore, there is evidence that Maddox is bonded with his half-brother, Jackson, and that Brandon B. makes no difference between the two children. All evidence suggests that Brandon B. has been a father to Maddox in every way. Given the child's young age, the fact that he has not seen Father since 2013, and the fact that he has known Brandon B. since he was approximately one year old, we conclude that there is clear and convincing evidence that there is no meaningful relationship between Maddox and Father and that a change in the child's circumstances would likely have a negative impact on the child's emotional and psychological wellbeing.

Concerning factor seven, the trial court's order states, in relevant part, that: The Court is concerned as to whether [Appellant] can stop his criminal drug activity which has resulted in his incarceration. As such, it is questionable as to whether [Appellant] could provide a safe and stable environment for the child upon his release from the penitentiary.

Although Father testified that he has changed since his incarceration and that he will not return to his criminal lifestyle on release, his testimony indicates a way of thinking that is contrary to this testimony. When asked about the time period that Father and Brittnie B. lived together, which was immediately after Maddox's birth, Father stated:

> [W[henever me and [Brittnie B.] went in our first house together, you know, I was selling a little bit of marijuana and stuff like that. Never looked at it as we was [sic] putting our child in any harm's way or anything . . .

Father also justified his drug dealing as necessary to pay his legal expenses so as to defend his parental rights. However, it is this pattern of thinking that has resulted in Father's current situation. Because Father apparently believes his justifications, his testimony does not convince this Court, as it did not persuade the trial court, that he will not choose to return to criminal activity after his release.

Finally, as to factor nine, i.e., whether the parent has paid support, we have previously addressed the fact that Father has not paid child support since the end of 2012. This fact is undisputed in the record. Therefore, from the totality of the circumstance and the record, we conclude that there is clear and convincing evidence that termination of Appellant's parental rights is in the child's best interest.

## V. Conclusion

For the foregoing reasons, we affirm the order of the trial court terminating Appellant's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Christopher H. Because Christopher H. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE

- 14 -